[No. 1800.]

### Dallas Logan *v.* The State.

1. Practice — Evidence.— Bill of Exceptions, reserved to evidence admitted over objection, must disclose the grounds of objection in order to authorize this court to revise the action of the court below.

2. Same.— The rule that, when evidence inadmissible *per se* has been admitted over objection, it will be presumed to have prejudiced the accused, whether or not it so did in fact, and is therefore ground for reversal, is a sound one when carried to its legitimate extent, but it cannot be extended so as to include the admission of evidence that is palpably harmless. When the rule is invoked, the bill of exceptions should show wherein the evidence complained of would tend to prejudice the case of the accused.

3. Same.— It is a settled rule that judgments, even in criminal cases, will not be reversed for immaterial errors.

4. Same — Evidence — Case Stated.— In a trial for murder the defense proposed to prove by one L. that, on the day prior to the homicide, one T. warned the defendant that the deceased had threatened his life, and that, on the day of the homicide and prior thereto, the said T. told the witness that the deceased was hunting for the defendant and threatening his life. The proposed evidence was excluded upon the ground that it was hearsay. *Held,* error, inasmuch as the object of the proposed evidence was to prove the communication made by T. to the defendant, and not to prove its truth or falsity.

5. Same — Threats.— When a defendant accused of murder seeks to justify his action on the ground of threats against his own life, he is permitted under our Code to introduce evidence of such threats whether communicated or not, but no threats will afford justification unless it be shown that, at the time of the homicide, the person killed, by some act then done, manifested an intention to execute the threats so made. One theory of the defense in this case being that, at the time of the homicide, the deceased by his acts manifested an intention of drawing a weapon to use upon the defendant, to

prevent which, and in defense of his own life, the defendant fired the fatal shot, the rejected evidence was material and important, and its exclusion was, for that reason, error.

6. SAME — CHARGE OF THE COURT. — It is a general rule that a charge of the court must be considered as a whole, and if good when so considered, objections to detached portions of it will not be reversible error.

7. SAME — SELF-DEFENSE. — Upon the question of self-defense, the trial court in a murder case charged as follows: "No man can bring on a dangerous conflict, slay his antagonist, and then justify on the ground of self-defense." *Held*, error, inasmuch as it states the rule too broadly and was calculated to mislead the jury. See the opinion *in extenso* for a statement of the true rule on the subject as applicable to the facts in this case.

APPEAL from the District Court of Tarrant. Tried below before the Hon. A. J. Hood.

The indictment charged the appellant with the murder of P. R. Smith, in Tarrant county, Texas, on the 1st day of June, 1873. He was convicted of murder in the second degree, and his punishment was assessed at a term of five years in the State penitentiary.

J. R. Law was the first witness for the State. He testified that he knew the defendant, and was acquainted with P. R. Smith, the deceased, in his life-time. The witness lived, at the time of Smith's death, which occurred early in June, 1873, about two and a half miles from Mansfield, in the direction of Fort Worth. Smith was shot on Robinson Prairie, about a quarter of a mile distant from the house of the witness. The shooting occurred between 9 and 10 o'clock in the morning. The witness was in his field hoeing cotton, when the shooting occurred. There was a skirt of timber between the place where the witness was at the time, and the place where the shooting took place. The witness heard the report of a pistol on the prairie, and then heard some one cry out in distress. He thereupon remarked to his little son, who was with him: "Somebody has been killed." Within another minute, the witness heard a second shot, and again heard the cry of distress. He and his son then went to the prairie, found some papers and blood, and saw some parties taking Smith to Mrs. Grimsley's house. It was the recollection of the witness that six shots in all were fired. The pleading and begging continued throughout the firing. The cries were not those of a person hallooing at cows, but were veritable cries of distress. Witness could distinguish a few words, such as "Oh Lordy, some one come here." The first two shots were about two minutes apart; the others followed each other in quick succession.

Witness went to the house of Mrs. Grimsley, to which Smith was carried, and where he died about 3 o'clock that evening. Witness

examined the body of Smith and found five wounds on it. The physician in attendance told Smith that he would die, and told the witness, who was a minister of the gospel, to talk to Smith. Witness began to talk to the dying man about his spiritual condition, when he said to the witness: "All right; I am not uneasy about the future." When asked about the origin of the difficulty, he said that the defendant had some of his cattle, or had stolen some of his cattle; that he followed the defendant, when the defendant, without cause, drew his pistol and began to fire upon him; that he told the defendant not to shoot, as he was not armed, and to convince the defendant of which he turned his pockets wrong side out, and held up his hands, but that defendant continued to shoot. Smith was fully conscious that he could not live when he made these statements. No arms were found on the body. Old man Logan, Tosh and Hart were with deceased when witness reached him.

Cross-examined, the witness stated that he made no halt at the point where he saw the blood and papers. From that point to the point where the witness overtook the party bearing the body of Smith, the distance was about one hundred yards. Witness did not know whose voice it was he heard calling. The skirt of timber between the prairie on which the shooting occurred and the witness's farm was about one hundred yards wide. The tract of land intervening was about a quarter of a mile wide. Mrs. Grimsley lived south of witness. The shooting occurred between the two houses. Witness did not see the defendant after the shooting until he was brought back for trial.

Doctor Moody, testifying for the State, described the wounds on the body of the deceased, declaring that three in the breast were flesh wounds, but that either of two others, one in the back and one in the rectum, was necessarily fatal. Witness told Smith that his death was inevitable. Smith told the witness that the difficulty arose over cattle; that rough language passed between him and defendant; that he, Smith, ran his hand into his pocket to get some paper and a pencil, when the defendant commenced firing; that he turned his pockets wrong side out to show the defendant that he was not armed, and begged him not to shoot. The defendant left the country after the shooting. The witness had known him intimately, and knew that he had previously sustained a good character.

Aaron Gibson testified, for the State, that he was at Mrs. Grimsley's house while Smith lay there wounded. Smith, with full knowledge that he would die, told the witness that he had sold the

defendant some cattle, and that the defendant took two more head than he was entitled to; that a difficulty arose over these two cattle; that he went to Logan's cattle herd and wanted Tosh to cut out and drive the two cattle back to his, Smith's, herd; that he told defendant that he wanted no difficulty, and turned his pocket wrong side out to show him that he was not armed; that defendant began to shoot, and he to run, when defendant shot him in the back. The defendant left the country after the shooting.

John Grimsley testified, for the State, that he was standing under a tree about one hundred yards from his mother's house when the shooting commenced. This was about 11 o'clock A. M. He did did not see the first shot fired, but heard it and immediately looked in the direction from which it proceeded. He then saw the defendant and Smith, both standing up. He saw the defendant fire one shot at Smith; saw Smith turn and run; saw defendant fire at him again, and saw Smith fall. He then saw the defendant run up and shoot Smith twice. Defendant then mounted his horse and fled across the country, whipping his horse furiously with his hat. In his attempted flight Smith ran towards the witness's mother's house. Witness's mother was at home on the day of the shooting. She was at home on the day of this trial, but was too ill to attend court. Witness's father was not at home on the day of the shooting. Witness was eight years old when Smith was killed. The weapon used by defendant was a pistol. Smith ran thirty or forty yards before he fell, and was overtaken by the defendant. Witness saw no other parties on the prairie near the shooting at the time it occurred. Witness saw Smith after he was brought to his, witness's, mother's house, and saw Mr. Law with him.

Neal Watts testified, for the State, that, at the time of the killing, he was fifteen or sixteen years old, and lived with his uncle John Vaughan, about one and a half miles north of the point where Smith was killed. About 11 o'clock on the morning of the homicide, the witness was standing in his uncle's lot and saw the defendant pass in a long gallop, whipping his horse with his hat. He came from the direction of Robinson Prairie. Witness's uncle asked him what was the matter. He, defendant, replied: "Nothing, only a dead dog on the prairie." The defendant passed quite near the witness and his uncle.

Frank Chrisman testified, for the State, that on the Saturday before the Tuesday of the homicide he met the defendant between Oak Grove, Tarrant county, and the Brazos river, going towards Mansfield. Defendant said that he and Smith had had a settlement,

but that he had taken two or three head of cattle more than agreed upon to pay for trouble. Two days later the witness met Smith's herd of cattle on the same trail. Defendant told the witness where Smith's herd was. Smith was not with his herd when witness met it. Witness could tell from the defendant's manner that his settlement with Smith had not been a pleasant one, though he said nothing hard against Smith. The State closed.

S. D. Hartman was the first witness for the defense. He testified that he was a juror on a former trial of this cause. Col. T. N. Buchanan, who was a witness for the defense, testified on that trial that he, Buchanan, was riding across the country on some business, and the witness inferred that the said Buchanan was on a road that ran east and west north of Grimsley's house; that he was between the place of the shooting and Grimsley's house, and about thirty or forty yards from the house; that he heard several shots in quick succession, stopped and looked in the direction from whence the shooting proceeded, expecting to see a deer, and thinking at the time that the shots were fired by some hunter. He looked but saw no one on the prairie. Buchanan did not say that he was on the Mansfield and Fort Worth road. He could not have been on that road and at the same time been between Grimsley's house and the place of the shooting. He must have been on the road which, leading across the prairie, crossed the Fort Worth and Mansfield road at right angles.

Ed. Hart was the next witness for the defense. He testified that he was herding cattle for the defendant at the time of the homicide. The defendant owned some sixty or seventy head. The shooting occurred near 10 o'clock in the morning. Besides the defendant and the deceased, old man Logan, the witness, and Tosh were present. Witness had been at the place since morning. Old man Logan had been there about an hour and a half: Tosh came up next, and the defendant and the deceased came last. They came together. They got off of their horses when they reached the herd. Old man Logan stood near where they dismounted. The witness was some forty yards off, herding. As he passed the parties, he heard Smith say to defendant: "You have cattle there that don't belong to you." Defendant replied that he had but one, which Smith could take, and explained that the one referred to was a yearling which he had tried unsuccessfully to expel from the herd. Smith replied that there were some cows in the herd to which the defendant had no bill of sale. This the defendant denied. Smith, squatting down, said: "We will figure on that." The two

figured and talked in a tone that witness could not hear. Presently the witness heard the defendant say: "I can't take that." Smith replied: "G—d d—n you, you will have to take it," at the same time rising from his sitting posture and running his hand in his pocket. Defendant rose, and as he did so he drew his pistol and fired at Smith. Smith turned slightly and his right hand seemed to hang in his pocket, and he either motioned with his left hand, or caught his pocket with it, and defendant fired again, and followed this shot up with three or four more. Smith continued to run around and fell at about the last shot. The cattle tried to stampede, and the witness was so busy preventing them that he did not look closely about the ground of the shooting. He, however, saw Mr. Tosh, who worked for Smith, pick up some paper, but witness could not say that he picked up a pistol. Smith fell some thirty or forty steps from where the first shot was fired.

William Logan, the father of the defendant, testified, in the latter's behalf, that he had been at the herd about thirty minutes when the defendant and Smith rode up together. As they came up Smith was cursing the defendant, and charging that he had cattle in his herd which he did not own. Defendant replied that he had but one yearling in the herd which was not his. He referred Smith to the herd, and told him how many cattle it contained to which he could show title, adding that, if the herd contained others, he could account for them. Smith started as though to count the cattle, but stopped, dismounted, squatted down and said: "We will figure on it some." Smith claimed that a settlement was still pending between himself and defendant. This the defendant disputed. Smith abused the defendant, denouncing him as a son-of-a-b—h and a cattle thief. He continued this abuse until the defendant told him that he had taken enough of his abuse. Smith raised up, thrust both hands in his pockets, and said: "G—d d—n you, you have got to take it." His right hand seemed to hitch in his pocket, and the defendant by this time fired. Smith grabbed his right pocket with his left hand, as if to aid in extricating his right hand, when the defendant fired again, breaking Smith's right arm. Smith then turned, thrust his left hand in his pocket, pulled it out and presented it at defendant. The witness did not know whether or not he had anything in his hand at that time, as he, witness, could not see on account of the smoke from the previous shots. Smith continued to dodge around until the last shot was fired, when he fell. The parties were then some distance apart. The defendant then mounted his horse and left in a walk or trot.

When the defendant left, Smith called to witness to come to him. Witness asked if he, Smith, would hurt him. Smith said he would not. Witness thereupon went to him, helped him up, and walked him about forty yards in the direction of Grimsley's house, when he said that he wanted to be let down. Smith then asked for water. Witness went to Grimsley's house, a quarter of a mile distant, got some water, returned and found Parson Law and his son with Smith. Law asked the occasion of the difficulty. Smith replied that it occurred about cattle. Smith was taken to Grimsley's house, where witness left him. Defendant left, and witness did not see him again for four years. He did not know where defendant was during that time, further than he said that he had been in New Mexico. At the end of four years the defendant came to witness's house in Wise county, and has since lived there and done business openly, until his arrest in 1882. He has frequently been in Fort Worth between the dates of his return and his arrest. He returned to Wise county in 1877 or 1878. By this witness the defense proposed to prove that, on the day before the homicide, John Tosh, deceased's hired hand, warned the defendant to be on his guard because Smith, the deceased, was hunting for him and would hurt him; and that the said Tosh, on the day of the homicide and prior thereto, came to witness's house and told the witness for God's sake to tell Dallas Logan, the defendant, to look out, for little Peter Smith, the deceased, was hunting for him and swore that he would have cattle or blood or something else; that witness informed defendant, before the homicide, of this statement made by Tosh to witness. On objection by the State, this proposed proof was excluded by the trial court on the ground that it was hearsay and because no evidence had been introduced tending to prove threats by the deceased. This ruling was duly excepted to by the defense, and raises one of the questions discussed and determined in the opinion of this court.

*Furman, Stedman & Capps*, for the appellant, filed an admirable brief and argument.

*J. H. Burts*, Assistant Attorney General, for the State.

White, Presiding Judge. One John Grimsley, a witness for the State, after being examined in chief was asked by the prosecuting officer " if his mother was not a witness for the State in this cause;" to which he answered in the affirmative. The State's attorney then asked said witness " why she was not here," and he said while she was not sick in bed, yet he thought that she was not well enough to

come." To all of which defendant excepted and moved the court to exclude the evidence, which motion was overruled and a bill of exceptions was reserved by defendant. This bill of exceptions does not state the grounds of objection urged to the evidence, and, failing to do so, we are not authorized or called upon to revise the ruling. (*Davis* v. *The State*, 14 Texas Ct. App., 645.)

Appellant in his brief urgently insists that the evidence, upon its face, being *per se* inadmissible, immaterial and foreign to any issue, was, to say the least of it, an incumbrance to the record and might tend to draw the attention of the jury from the true issue and thereby prejudice the rights of appellant; and the rule is invoked that, whether it had such effect or not, it, being incompetent and having been admitted over objection, will be presumed to have prejudiced him. (*Tyson* v. *The State*, 14 Texas Ct. App., 388.) We do by no means dispute the correctness of the rule to the legitimate extent to which it applies, but we cannot see in this instance that the statement that Mrs. Grimsley was a witness for the State, and was sick and unable to attend the trial, would in itself have any tendency to distract the minds of the jury from the issues in the case, and necessarily tend to prejudice the rights of defendant. A number of matters have to be inferred before we would be warranted in concluding that it could possibly have such effect. To entitle the defendant to a revision of the ruling, he should have shown by his objections, incorporated into the bill of exceptions, the grounds upon which the testimony would tend to prejudice the case. If the evidence is apparently harmless, though it may be *per se* incompetent, we imagine it would not be ground for reversible error. To be reversible error — that is, such as would warrant this court in reversing upon the ground of its incompetency — it must appear or be made to appear wherein it would also tend to prejudice the defendant. " A judgment, even in a criminal case, will not be reversed for immaterial errors." (*McKnight* v. *The State*, 6 Texas Ct. App., 158.) If the tendency of the evidence appears prejudicial or injurious, courts will then indeed rarely presume that the particular evidence which had been wrongfully admitted could have no influence on the deliberations of the jury." (Whart., Cr. L., § 3090.)

The second ground relied upon for a reversal of the judgment of conviction in this case is the action of the court in refusing to permit appellant to prove by Wm. Logan, that, on the day before the homicide, one John Tosh, who was the hired hand of the deceased Smith, had warned the appellant to be on his guard, as Smith was hunting for appellant, and would hurt him, and that on the day of the kill-

ing, and prior thereto, the said John Tosh came to the house of said witness, William Logan, and told him, witness, "For God's sake to tell Dallas Logan, appellant, to look out, for that little Peter Smith, the deceased, was hunting for him, and swore that he would have cattle, blood or something else;" and that he, witness, had, prior to the homicide, informed appellant of what Tosh had said. The court in excluding this evidence appended to the bill of exceptions a statement that "Any proof tending to prove threats, except hearsay, would be admitted." The offered evidence was therefore excluded as hearsay.

Was the evidence hearsay? What was the fact sought to be proven? Not that the threats had in fact been made, but that they had been communicated to defendant. If the object had been to prove that the threats had been made, then, indeed, the fact that Tosh said they had would have been hearsay and inadmissible. But that Tosh had communicated to defendant the fact that deceased had made threats against his life was a fact which could as well be proven by any one who was present and heard Tosh communicate this fact to defendant as could it have been proven by Tosh himself. This would not be hearsay. Mr. Greenleaf says: "It happens in many cases that the very fact in controversy is whether such things were written or spoken, and not whether they were true. . . . In such cases it is obvious that the writings or words are not within the meaning of hearsay, but are original and independent facts, admissible in proof of the issue. . . . This doctrine applies to all other communications wherever the fact that such communication was made, and not its truth or falsity, is the point in controversy." (1 Greenl. Evid., §§ 100, 101.)

If the witness Logan heard Tosh communicate to defendant the fact that the threat had been made by Smith, then the testimony of Logan that such communication was made was not hearsay; that it was made to defendant was a fact which he could know and testify to as well as Tosh. It was error to exclude the evidence upon the ground that it was hearsay.

That the evidence was important and material cannot be questioned. Where a defendant seeks to justify his action, when accused of murder, upon the grounds of threats against his life, our Code permits him to introduce evidence of such threats whether communicated or not, but no threats are allowed to afford justification unless it be shown that, at the time of the homicide, the person killed, by some act then done, manifested an intention to execute the threat so made. (Penal Code, art. 608.)

In the case we are considering the theory of the defense was that, at the time defendant drew his pistol, the deceased, by his acts and conduct, was apparently about to draw a weapon to be used upon defendant, and that defendant drew and fired his pistol to prevent the danger and in defense of his own life.   In view, then, of this theory of the defense, the admissibility of the excluded evidence did not depend upon the truth of the statements made by Tosh to defendant, but on the effect which it might produce on his mind as an inducing cause for more prompt action on his part to prevent the apprehended danger.   (*Carico* v. *Comm.*, 7 Bush., Ky., 124; Cases of Self-defense, Horrigan & Thompson, 389.)   Considered in this aspect of the case, the evidence was both material and important, and the court erred in its exclusion from the jury.

Several objections are urged to the charge of the court to the jury. In most instances these criticisms and objections are made to detached portions and paragraphs, whilst at the same time it is admitted that the supposed errors are fully corrected and supplied by other portions of the charge.   A general rule is that a charge must be considered as a whole, and, if good when so considered, objections to detached portions will not be held to be reversible error. In this case, most of the objections thus urged are, in our opinion, not of a character to have likely misled the jury or injured the rights of defendant, when we consider the objections in the light of the whole charge.   There is one, however, which we think does not come within the rule, and which submits a question for serious consideration.   In one of the paragraphs the jury were told that " no man can bring on a dangerous conflict, slay his antagonist, and then justify on the ground of self-defense."   This was stating the rule too broadly, and was calculated to mislead the jury.   As said by appellant's counsel in his brief, under this charge " a person would be guilty of murder, although he may have innocently or ignorantly brought on a dangerous conflict in which his adversary is slain.   It would make no difference whether he brought it on wrongfully or rightfully.   The only question is:   Did he bring on a dangerous conflict?   If he did, he is guilty of murder.   It makes no difference, under this charge, what the intention of the defendant was, or what steps he may take to avoid the necessity of killing his antagonist, after the difficulty had been brought on, he is a murderer."

Upon this subject the proper rule, as applicable to the facts here shown, is the one announced in Gilleland's case as follows:   " If the defendant voluntarily engages in a combat, knowing that it will or may result in death, or some serious bodily injury which may

probably produce the death of his adversary or himself, or by his own wrongful act brings about the necessity of taking the life of another to prevent being himself killed, he cannot say that such killing was in his necessary self-defense; but the killing will be imputed to malice, express or implied, by reason of the wrongful act which brought it about or malice from which it was done." (44 Texas, 356.) A person cannot avail himself of a necessity which he has knowingly and wilfully brought upon himself. (*Reed* v. *The State*, 11 Texas Ct. App., 509; *King* v. *The State*, 13 Texas Ct. App., 277.)

For the errors pointed out, the judgment is reversed and the cause remanded for a new trial.

*Reversed and remanded.*

[Opinion delivered October 22, 1884.]